# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

**UNITED STATES OF AMERICA**,

      Plaintiff,

vs.                                     No. CR 07-748 MCA

**BENJAMIN RAYMOND**,

      Defendant.

## <u>REDACTED MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the following motions:  (1) Defendant Benjamin Raymond's *Motion to Dismiss* [Doc. 308] filed on August 19, 2008; (2) the Government's *Motion to Quash Subpoena Issued on October 9, 2008* [Doc. 388] regarding the Rio Rancho Department of Public Safety filed on October 16, 2008; (3) the Government's *Motion to Quash Subpoena* [Doc. 397] regarding Assistant United States Attorney Louis Valencia filed on October 20, 2008; (4) Defendant Raymond's *Motion to Sever Trials* [Doc. 425] filed on November 17, 2008; (5) *Defendant's Motion to Suppress Evidence Seized from 313 C Geraldine Loop, Rio Rancho, New Mexico* [Doc. 433] filed on November 17, 2008; and  (6) *Defendant's Motion to Suppress Evidence Seized from 1992 Blue Chevrolet Camaro* [Doc. 435] filed on November 17, 2008  The Court held hearings regarding Defendant's *Motion to Dismiss* [Doc. 308] in Albuquerque, New Mexico on October 24, 2008, and January 5, 2009.  Between those dates, the Court also conducted an

*in camera* review of files produced by the Rio Rancho Department of Public Safety (RRDPS) and the United States Attorney's Office (USAO).

Having considered the parties' submissions, the applicable law, the evidence and arguments presented at the hearings, and being fully advised in the premises, the Court finds that the present charges against Defendant Raymond arise out of conduct by him that was known to the USAO on or before October 14, 2004, the date of his plea agreement in United States v. Raymond, No. 03cr2066 MV, Doc. 45 (D.N.M. plea agreement filed Oct. 14, 2004). The Court further finds that in the prior plea agreement, the United States Attorneys Office for the District of New Mexico promised not to bring the present charges against Defendant Raymond under these circumstances. Based on these findings, the Court concludes that Defendant Raymond is entitled to specific performance of the USAO's promise in his prior plea agreement, with the result that Counts 1, 2, 3, 4, 5, 7 and 8 of the *Superseding Indictment* [Doc. 36] in the present case must be dismissed without prejudice as to Defendant Raymond only.

The Court therefore grants Defendant Raymond's motion to dismiss. The Court also grants Defendant Raymond's motion to sever all further proceedings against him and denies the remaining motions as moot for the reasons set forth below

I.      **BACKGROUND AND FINDINGS OF FACT**

The prior plea agreement that is the subject of the pending motion to dismiss was executed on October 14, 2004, and was presented to the Honorable Martha Vazquez at the change of plea hearing held on that date; Mr.Raymond was subsequently sentenced on

December 15, 2004.  The operative chronological timelines giving rise to the pending motion

to dismiss can be stated as follows:

1.      Ms. Josie Robinson reported to Rio Rancho police authorities that Mr. Henry George

was  missing on June 22, 2002.

2.      Rio Rancho police authorities believed at that time that Mr. George was likely the

victim of a homicide, and Defendant Raymond was identified as a suspect.

3.      Albuquerque police officers arrested Defendant Raymond and Ms. Robinson on June

29, 2002, at which time Defendant Raymond had one or more firearms in his possession.

4.      Communications between the Albuquerque police and the Rio Rancho police, and

between the Albuquerque police and the United States Attorneys Office, began shortly after

the arrest of Defendant Raymond and Ms. Robinson on June 29, 2002.

5.      Defendant Raymond was subsequently indicted on October 17, 2003, for being a felon

in possession of a firearm.

6.      In the spring of 2004 the United States Attorney's Office and Defendant Raymond

began negotiating a plea agreement in that case.

7.      A proposed plea agreement was sent to Mr. Raymond's attorney by the AUSA on

April 28, 2004.

8.      Prior to the change of plea hearing and on May 11, 2004,  The Honorable Martha

Vazquez ordered the United States Probation Office to prepare a Form 13 Pre-Plea  Pre-

Sentence Investigation Report.

9.      That report was completed on July 8, 2004, and delivered to counsel.  In that Report, Mr. Raymond was reported be a member of or affiliated with the "AB", an obvious abbreviation for "Aryan Brotherhood".

10.      Mr. Raymond appeared at a change of plea hearing on October 14, 2004.

11.      The Plea Agreement which is the subject of the motion to dismiss was signed by Mr. Raymond and his then attorney, Assistant United States Public Defender Benjamin Gonzales, and Assistant United States Attorney Louis Valencia.  In that Plea Agreement, the United States Attorneys Office promised that it "*will not bring additional charges against the defendant arising  out of defendant's conduct now known to the United States Attorney's Office for the District of New Mexico.*"

12.      Mr. Raymond was sentenced by Judge Vazquez on December 15, 2004.

13.      On July 6, 2006, skeletal remains were discovered on the west mesa of Albuquerque and were subsequently identified as those of Henry George.

In his pending motion to dismiss, Defendant Raymond asserts that his alleged conduct giving rise to the present charges was known to the United States Attorney's Office at the time that he entered into his plea agreement in No. 03cr2066MV, and therefore falls under the plea agreement's promise "not to bring additional charges ...arising out of the defendant's conduct" the USAO knew at that time.

In addressing the merits of the pending motion, the Court necessarily must scrutinize the relationships among a series of concurrent law-enforcement investigations in the greater Albuquerque metropolitan area (including the cities of Albuquerque and Rio Rancho) that

gave rise to both the present case (No. 07cr748 MCA) and a prior case (No. 03cr2066 MV) against Defendant Benjamin Raymond in the United States District Court for the District of New Mexico.   The records and materials reviewed and considered by the Court are voluminous; the analysis is considerably fact intensive.   In the earlier case, the USAO brought an indictment on October 17, 2003, charging Defendant Raymond with being a felon in possession of a firearm on or about June 29, 2002.   [No. 03cr2066 MV, Doc. 1.]   In the present case (No. 07cr748 MCA), Defendant Raymond is facing charges arising under the "violent crimes in aid of racketeering" statute, 18 U.S.C. § 1959(a), which allegedly were committed during the months of June and July 2002.   [Doc. 36.]

### A.    Law Enforcement Investigations Commencing in June 2002

The indictment in No. 03cr2066 MV arose from an incident on June 29, 2002, when officers from the Albuquerque Police Department (APD) encountered Defendant Raymond and another individual, Josie Robinson, while responding to a call from an Albuquerque used-car dealership reporting an attempt to pass a fraudulent check.   During that encounter, the APD officers discovered several items of evidence suggesting an organized effort to forge checks and negotiate them using one or more false identities.   At that time, the APD officers also discovered that Defendant Raymond and Ms. Robinson each had one or more firearms in their possession and that Defendant Raymond and Ms. Robinson each had prior felony convictions.   An APD detective indicated in his report that, "upon conducting an interstate identification index request on [Defendant] Raymond," which revealed his prior felony convictions, "Detective Garcia of the APD Intelligence Unit was contacted in regards

to 'Project Exile.'"  [Ex. 2 to Doc. 380, at Bates No. 000034.]  "As a result of this conversation, it was decided that [Defendant] Raymond would be booked into BCDC on the aforementioned felony warrants and on charges that would be forthcoming from the U.S. Attorneys Office regarding felon in possession of a handgun."  [Id.]

During the incident at the car dealership on June 29, 2002, Ms. Robinson also reported to the APD officers that she was involved in an investigation into the disappearance of Henry George that was initiated by officers from the Rio Rancho Department of Public Safety (RRDPS) a few days earlier.  One of the APD officers in turn contacted Lieutenant Noel Adams of the RRDPS, who confirmed that  Ms. Robinson and  Defendant Raymond were mentioned in reports concerning the investigation of Mr. George's disappearance from an apartment in Rio Rancho, New Mexico, which is a suburban community adjacent to Albuquerque.  Lieutenant Adams also advised the APD officer that further evidence of check forgery and false identification documents was found during the searches of Mr. George's apartment and Defendant Raymond's apartment, both of which were located in the same apartment complex in Rio Rancho, New Mexico.  [Ex. 2 to Doc. 377-3, at 6-11.]

Ms. Robinson's involvement in the investigation of Mr. George's disappearance, as well as the evidence suggesting her involvement in other crimes such as  forgery and identity theft, are documented in police reports contained in the RRDPS files that were produced to this Court.  These reports indicate that on June 22, 2002, Ms. Robinson first spoke with officers from the RRDPS about Mr. George's disappearance.   In her conversation with RRDPS officers on that date, Ms. Robinson alleged that Defendant Raymond and others

were involved in a Neo-Nazi prison gang called the Aryan Brotherhood; she also suggested that Mr. George's disappearance was linked to the workings of that gang.  [Ex. 2 to Doc. 377-3.]

The investigation into Mr. George's disappearance that was prompted by Ms. Robinson's statements on June 22, 2002, eventually culminated in the *Superseding Indictment* [Doc. 36] filed in the present case (No. 07cr748 MCA), which charges Defendant Raymond and three other Defendants (Bradley Wasson, Travis Dally, and Jeremiah Looney) with several violent crimes in aid of racketeering under 18 U.S.C. § 1959(a).  These violent crimes in aid of racketeering include conspiracy, kidnapping, and murder of Mr. George, as well as a related conspiracy and attempt to murder another individual, [name redacted][1], who is anticipated to serve as a government witness with respect to Mr. George's disappearance.

Shortly after his arrest by APD officers on June 29, 2002, and well before any federal charges were filed against him in No. 03cr2066 MV or 07cr748 MCA, Defendant Raymond appeared in the Second Judicial District Court for Bernalillo County, New Mexico for proceedings regarding the revocation of his probation on an earlier set of state charges dating from the year 2000.  See United States v. Raymond, Nos. D-202-CR-200003262 & D-202-CR-200003101 (2nd Jud. Dist. Ct. orders revoking probation filed Aug. 20, 2002).  He was then placed in custody at the Bernalillo County Detention Center and subjected to a custodial interview by  RRDPS Detective David Hubbard as part of the investigation of Mr. George's

---

[1]Certain information in this *Memorandum Opinion and Order* has been redacted.  An unredacted version is filed under seal.

disappearance. Detective Hubbard later testified that Defendant Raymond denied any knowledge of Mr. George's disappearance during the interview. [Doc. 416, Tr. 10-24-08, at 76-77.]

In addition to interviewing Defendant Raymond, the law enforcement officers investigating Mr. George's disappearance obtained search warrants for Defendant Raymond's apartment and his car, which had been seized during a traffic stop conducted by an officer of the Sandoval County Sheriff's Department (SCSD) on June 21, 2002. Bradley Wasson, one of the co-defendants in No. 07cr748 MCA, was driving Defendant Raymond's car at the time of that traffic stop and was subsequently arrested. Sandoval County, New Mexico is adjacent to, and directly north of, Bernalillo County and the City of Albuquerque.

[Name redacted], an anticipated government witness in No. 07cr748 MCA, also was in the car at the time of the traffic stop. On July 17, 2002, [name redacted] was severely beaten while in custody on state charges. Defendant Raymond, as well as two of his co-defendants in No. 07cr748 MCA (Travis Dally and Jeremiah Looney) allegedly were housed in the same detention facility at the time [name redacted] was beaten.

Police reports from SCSD regarding the traffic stop of June 21, 2002, as well as reports from APD regarding the encounter with Defendant Raymond and Ms. Robinson on June 29, 2002, were incorporated into the RRDPS file regarding the investigation of Mr. George's disappearance. The RRDPS also sent items retrieved during the searches of Defendant Raymond's car and apartment, as well as the search of Mr. George's apartment,

to the state crime lab for analysis.  In addition, the RRDPS conducted follow-up interviews with other witnesses, including Ms. Robinson and [name redacted].  [Ex. 3 to Doc. 377-4.]

One of the RRPDS' follow-up interviews with Ms. Robinson on July 10, 2002, revealed evidence of her involvement in additional crimes that, together with the evidence obtained by APD during the earlier incident on June 29, 2002, eventually gave rise to charges against her in state and federal courts.  On June 23, 2005, the USAO filed a three-count indictment charging Ms. Robinson with possession of a firearm with an obliterated serial number and possession of various false or counterfeit documents in Sandoval County, New Mexico on or about July 10, 2002.  See United States v. Robinson, No. 05cr1321 JEC, Doc. 1 (D.N.M. filed June 23, 2005).  A fourth count alleging Ms. Robinson possessed an unregistered firearm in Bernalillo County, New Mexico on or about June 24, 2002, was added by way of a superseding indictment filed on March 15, 2006.  [No. 05cr1321 JEC, Doc. 16.]

As noted in a sentencing memorandum [No. 05cr1321 JEC, Doc. 36], the USAO filed the above federal charges against Ms. Robinson shortly before she was to be released from incarceration on state charges filed on March 25, 2003, in the Second Judicial District Court for Bernalillo County, New Mexico.  See State v. Robinson, No. D-202-CR-200300848 (N.M. Dist. Ct. June 20, 2003).  Those state charges of possessing a controlled substance, possessing drug paraphernalia, and possessing an altered/forged/fictitious license, appear to have arisen from the same encounter with APD officers and Defendant Raymond at the used car dealership on or about June 29, 2002.

Thus, at the time the USAO brought the indictment against Defendant Raymond in No. 03cr2066 MV on October 17, 2003, there was a pending investigation into Mr. George's disappearance that necessarily involved some degree of overlap and coordination among several state and local law-enforcement agencies, prosecutors, and correctional authorities. All of the Defendants in the present case, as well as [name redacted] and Ms. Robinson, had been detained in connection with criminal charges in state court before that date, and thus it was necessary for some if not all of the above agencies to coordinate with one another in order to make decisions about where and under what conditions to detain the above individuals, arrange for interviews while they were in custody, identify the offenses with which to charge them, and identify the proper jurisdiction in which to charge them. Under these circumstances, it is highly unlikely and not plausible that a federal prosecutor or law-enforcement agency could have obtained police reports regarding Defendant Raymond's arrest by APD officers on June 29, 2002, and related criminal-history information necessary to bringing the charge of being a felon in possession of a firearm on that date, without also coming across some link to, or background information concerning, the RRDPS' pending investigation into Mr. George's disappearance and related racketeering activity attributed to the Aryan Brotherhood.

**B.**     **The Record of Proceedings in No. 03cr2066 MV Leading Up to the Change of Plea Hearing on October 14, 2004.**

The USAO also had occasion to learn of Defendant Raymond's alleged affiliation with the Aryan Brotherhood, and related criminal history, when the Honorable Martha

Vazquez ordered the United States Probation Office (USPO) to conduct a "Form 13" pre-plea pre-sentence investigation in No. 03cr2066 MV on May 11, 2004.  [No. 03cr2066 MV, Doc. 35; Ex. 14 to Doc. 401.]  That report was prepared in response to concerns about whether Defendant Raymond's extensive criminal history would expose him to a mandatory minimum sentence of at least 15 years under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e).  [No. 03cr2066 MV, Doc. 35, 42.]  The pre-plea pre-sentence report disclosed to the Court and counsel on or about July 8, 2004, indicated, among other things, that Defendant Raymond was or became affiliated with the "AB," an obvious abbreviation for "Aryan Brotherhood," during a period of incarceration which preceded his arrest on June 29, 2002.

In addition to ordering the pre-plea pre-sentence report, Judge Vazquez heard and ruled upon a number of motions regarding Defendant Raymond's pretrial release in No. 03cr2066 MV.  [No. 03cr2066 MV, Doc. 4, 5, 7, 12, 13, 14, 16, 17, 18, 19, 24, 25, 28, 31, 32, 33, 36, 37, 38, 40.]  In those hearings, the Government vigorously contested Judge Vazquez's decision to release Defendant Raymond on conditions, arguing that he was a danger to the community and a flight risk in light of his past criminal history and the potentially lengthy sentence he was facing in No. 03cr2066 MV.  Nevertheless, the Tenth Circuit affirmed Judge Vazquez's rulings with respect to pretrial release in an interlocutory appeal that concluded on July 16, 2004.  See United States v. Raymond, No. 04-2105 (10th Cir. 2005) (unpublished order).

-11-

After the interlocutory appeal concluded and the USPO disclosed its pre-plea pre-sentence report for Defendant Raymond in No. 03cr2066 MV, Judge Vazquez convened a change-of-plea hearing on October 14, 2004.  At that hearing, counsel produced a plea agreement signed on that date in which Defendant Raymond agreed to plead guilty to the crime charged in the indictment in exchange for promises from the USAO which included an agreement that the USAO "will not bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico." [No. 03cr2066 MV, Doc. 45; Ex. 1 to Doc. 308, at 5.]  Assistant United States Attorney Louis Valencia appeared for the Government at the change-of-plea hearing.

During the change of plea hearing, Mr. Valencia stated the factual basis for the plea agreement using language that very closely tracks (sometimes verbatim) the police reports prepared by APD and mentions the names of specific APD officers involved in the search and seizure of Defendant Raymond's person on June 29, 2002.  Mr. Valencia also referred to Defendant Raymond's criminal history, noting that he had outstanding felony arrest warrants, was an absconder from parole, and had several felony convictions at the time of his arrest.  At the conclusion of the change-of-plea hearing, Judge Vazquez told Defendant Raymond that she "will accept" his plea of guilty and allowed him to continue his conditions of release pending sentencing.   [Tr. 10-14-04, Ex. 2 to Doc. 308.]

A Sentencing Hearing was held on December 15, 2004.  The main issue addressed in the parties' sentencing briefs and in their arguments at the sentencing hearing in No.

-12-

03cr2066 MV was the legal question of whether Defendant Raymond's prior convictions qualified him as an "armed career criminal" subject to a mandatory minimum sentence of fifteen years pursuant to 18 U.S.C. § 924(e).  [No. 03cr2066 MV, Doc. 46, 49, 50.]  A subsidiary factual dispute also arose with respect to whether the Court should follow the pre-sentence report's recommendation for voluntary surrender.

At the sentencing hearing on December 15, 2004, Mr. Valencia objected to the recommendation that Defendant Raymond be given voluntary surrender.  He argued that the Pretrial Services officer who made the recommendation for voluntary surrender "was not aware that Mr. Raymond was suspected of a murder up in Rio Rancho, New Mexico."  [Ex. 3 to Doc. 308-4, Tr. 12-15-04, at 22.]  At the sentencing hearing, Mr. Valencia also referred to a series of police reports regarding Defendant Raymond's suspected involvement in Mr. George's disappearance that were sent to Judge Vazquez on December 10, 2004.  [Tr. 12-15-04, at 4, 22-24.]  Such reports also were provided to Assistant Federal Public Defender Benjamin Gonzales, the attorney who represented Defendant Raymond in No. 03cr2066 MV. Despite these reports, Judge Vazquez permitted Defendant Raymond to voluntarily surrender and begin serving the fifteen-year mandatory minimum sentence that she imposed in No. 03cr2066 MV.  Defendant Raymond surrendered voluntarily and began his incarceration at the Federal Correctional Institute in Florence, Colorado on February 22, 2005.  [No. 03cr2066 MV, Doc. 57, 58, 60.]

### C.   The Record of Proceedings in No. 07cr748 MCA

The law-enforcement investigation into Mr. George's disappearance continued after Defendant Raymond began serving his sentence in No. 03cr2066 MV.  On July 6, 2006, a skull and jawbone later identified as that of Mr. George was discovered on a mesa west of Albuquerque and brought to the attention of police.  On July 28, 2006, and a number of subsequent dates, Defendant Travis Dally allegedly made incriminating statements about Mr. George's murder to one or more undercover agents and/or confidential sources working with the Federal Bureau of Investigation (FBI).  An arrest warrant for Defendant Dally referencing the murder investigation was issued in state court on April 16, 2007.  [Ex. 3 to Doc. 377-4.]

Two days later, on April 19, 2007, the present case began with a *Sealed Indictment* [Doc. 1] charging Defendant Bradley Wasson with a single count of being a felon in possession of a firearm during the traffic stop in Sandoval County, New Mexico on June 21, 2002.  That indictment was superseded on June 20, 2007, with the result that Defendant Raymond, as well as Defendants Wasson and Dally, are now charged with several violent crimes in aid of racketeering that arise from the alleged kidnapping and murder of Henry George on or about June 20, 2002 (Counts 1 through 5).  Defendant Raymond, as well as Defendants Dally and Looney, also are charged with violent crimes in aid of racketeering that arise from the alleged attempted murder of [name redacted] on or about July 17, 2002 (Counts 7 and 8).  [Doc. 36.]  The Government alleges that during the times relevant to the *Superseding Indictment*, all of these Defendants were associated with the "Aryan Brotherhood," which is alleged to constitute an "enterprise" that is engaged in "racketeering

activity" within the meaning of the violent crimes in aid of racketeering statute.  18 U.S.C. § 1959(a).

On August 19, 2008, Defendant Raymond filed a motion to dismiss all the charges that the USAO brought against him in the *Superseding Indictment* [Doc. 36] in the present case (No. 07cr748 MCA) on the grounds that the USAO's bringing of these charges violated the terms of his plea agreement in No. 03cr2066 MV.  [Doc. 308.]  In particular, Defendant Raymond asserts that his alleged conduct giving rise to the present charges was known to the USAO at the time he entered into his plea agreement in No. 03cr2066 MV, and therefore falls under the plea agreement's promise "not to bring additional charges . . . arising out of the defendant's conduct" the USAO knew at that time.  [Ex. 1 to Doc. 308-2, at 5.]

The Government did not file any substantive response to Defendant Raymond's motion to dismiss the present charges until the Court imposed a deadline of September 26, 2008.  [Doc. 352, 355, 357.]  On that date, the Government's counsel asserted that "the FBI did not have access to the state and local police reports [regarding Mr. George's disappearance] until November 11, 2004."  [Doc. 369, at 10.]  To support this assertion, the Government produced an FBI "Form 302" by Special Agent Theodore D. Griego indicating (without explanation) that the state and local police reports in question were received by that agency via facsimile from RRDPS Detective David Hubbard on November 11, 2004, less than one month after the change-of-plea hearing.  [Ex. 1 to Doc. 377-2.]  It is these same police reports, or portions thereof, that Mr. Valencia submitted to Judge Vazquez and Attorney Benjamin Gonzales shortly before the sentencing hearing in No. 03cr2066 MV.

Defendant Raymond filed a reply brief on October 3, 2008, disputing the Government's assertion that the USAO did not know of Defendant Raymond's alleged conduct relating to Mr. George's disappearance until after Special Agent Griego received the police reports on November 11, 2004.  [Doc. 377.]

### D.   Evidentiary Hearings Convened on the Motion to Dismiss

To resolve this factual dispute and hear argument on the legal basis for Defendant Raymond's motion, the Court set a hearing on October 24, 2008.  Before that date, however, the Government moved to quash Defendant Raymond's subpoenas for the RRDPS files regarding its investigation of Mr. George's disappearance and for Mr. Valencia's testimony and files pertaining to his involvement in No. 03cr2066 MV.  [Doc. 388, 397, 403, 405.]  In its motion to quash the subpoena pertaining to Mr. Valencia's files and testimony, the Government also invoked the Touhy regulations set forth at 28 C.F.R. §§ 16.21 to 16.29 (2008).

Nevertheless, Defendant Raymond was able to present his own testimony as well as that of Attorney Benjamin Gonzales at the hearing on October 24, 2008, pursuant to a limited waiver of attorney-client privilege.  The direct examination of Mr. Gonzales concerning his communications with his client and Mr. Valencia in No. 03cr2066 MV consisted of the following:

> Q.   Mr. Gonzales, did there come a time in this matter when you had a conversation with Mr. Raymond in your office about what he was likely to be looking at on his plea of guilty to felon in possession charges?
>
> A.   Yes.

-16-

Q.      Do you recall approximately when that conversation occurred? Do you know if it was before or after his plea?

A.      Oh, it was certainly before his plea.

Q.      Do you recall having a conversation with Mr. Raymond about how he could help himself by cooperating with the federal authorities?

A.      Yes.

Q.      Will you relate to the Court essentially what that conversation involved?

A.      I had learned from Mr. Valencia, the prosecutor, that there was an investigation concerning a disappearance and possibly a murder in Rio Rancho.  And I don't remember.  I couldn't quote Mr. Valencia.  It's been too long ago.

Q.      Okay.

A.      But my impression was that the government was interested in my client, Benjamin Raymond, and Mr. Valencia inquired whether Mr. Raymond would be interested in cooperating, at least talking with federal authorities.

Q.      And did you relay that interest to Mr. Raymond?

A.      I did.

[Doc. 416, Tr. 10-24-08, at 37-38.]

I find that Mr. Gonzales testified credibly.  After Mr. Gonzales testified, Defendant Raymond took the stand himself for the limited purpose of testifying about his understanding of the plea agreement in No. 03cr2066 MV.  On direct examination, Defendant Raymond testified that he met with Mr. Gonzales to discuss the plea bargain that was being offered in No. 03cr2066 MV at some point after the pre-plea pre-sentence report was completed but before he signed the plea agreement.  He further testified that he was aware of the

-17-

Government's promise in the plea agreement to the effect that he would not be prosecuted for crimes arising from conduct then known to the USAO.  In light of this promise, Defendant Raymond testified that he was not concerned about being prosecuted by the USAO for any additional crimes because he thought that all of his prior conduct was already known to the USAO and would therefore be precluded by his plea agreement.  On cross-examination, Defendant Raymond further explained the basis for this belief as follows:  "I assumed at the time after seeing the pre-sentence report that the government knows every single, solitary thing, including getting kicked out of the fourth grade, and that's any conduct I did whatsoever."  [Doc. 416, Tr. 10-24-08, at 51-52, 56.]  I find that Defendant Raymond's testimony was credible.

Because the Government continued to object to the subpoena for the RRDPS files as well as the subpoena for the files and testimony of Mr. Valencia at the hearing on October 24, 2008, the Court allowed Defendant Raymond to defer presenting additional evidence in support of his motion until further progress was made in resolving the Government's objections.  The Court also allowed the Government to call three witnesses to testify at the hearing on October 24, 2008, without the benefit of the requested files.

First, RRDPS Detective David Hubbard testified that although he was actively investigating Mr. George's disappearance from about June 23, 2002, onward, he did not have any contact with federal authorities investigating the death of Mr. George until November 2004, when he received a telephone call from FBI Special Agent Theodore Griego.  [Doc. 416, Tr. 10-24-08, at 65-66, Doc. 416.]  Detective Hubbard testified that he subsequently met

-18-

with Special Agent Griego and an individual named Don Mangin, who was employed by the Department of Corrections and assigned to a joint terrorism task force with the FBI.  [Id. at 67.]  At the direction of Special Agent Griego, Detective Hubbard also contacted ATF Agent Paul Jessen in November 2004 to inquire about testing a firearm.  [Id. at 68, 80.]

On cross-examination, Detective Hubbard admitted that he was not the only RRDPS detective who knew about the investigation of Mr. George's disappearance.  Detective Hubbard also admitted that he received information about Defendant Raymond from other sources, such as "Lieutenant Adams," who is listed on one of the police reports as one of the individuals who communicated with an APD officer concerning the arrest of Defendant Raymond and Ms. Robinson on June 29, 2002.  [Id. at 72-75; Ex. 2 to Doc. 377-3.] Detective Hubbard further testified that he arranged to interview Defendant Raymond while he was detained on the state charges arising from that arrest, which would have entailed some communications with corrections officials or the agency responsible for detaining Defendant Raymond at that time.  [Doc. 416, Tr. 10-24-08, at 76.]

The cross-examination of Detective Hubbard also revealed that there may have been some delay in the preparation of his written reports.  For example, Detective Hubbard's report concerning the follow-up interview with Ms. Robinson that occurred on July 10, 2002, was not prepared until November 12, **2004.**  [Id. at 77-78.] Thus, it is reasonable to infer that Detective Hubbard relied, at least in part, on informal oral communications to conduct his investigation of Mr. George's disappearance prior to the federal involvement in November 2004, when more thorough documentation was requested.

-19-

After Detective Hubbard's testimony described above, the Government called ATF Agent Jessen and FBI Special Agent Griego, both of whom corroborated Detective Hubbard's statement that he first communicated with them about the RRDPS investigation into Mr. George's disappearance in November 2004. Agent Jessen further testified that as a result of the information Detective Hubbard provided to him at that time, he was able to identify Defendant Wasson and [name redacted] as convicted felons. Defendant Wasson was subsequently charged with being a felon in possession of a firearm in the present case, and [name redacted] faced a similar charge in another case brought by the USAO in 2005. See [case citation redacted].

Agent Jessen also admitted, however, that he was not the case agent assigned to work with Mr. Valencia on the felon-in-possession charge against Defendant Raymond in No. 03cr2066 MV. Rather, the ATF case agent in No. 03cr2066 MV was Phil Foutz, who was not called as a witness at any of the hearings on Defendant Raymond's motion to dismiss the charges in No. 07cr748 MCA. Despite the fact that he was not the case agent in No. 03cr2066 MV, Agent Jessen testified that he brought the RRDPS reports regarding the investigation of Mr. George's disappearance to the attention of Mr. Valencia in November 2004. [Id. at 89-91.] Agent Jessen admitted on cross-examination that he did not know for sure how the felon-in-possession charge against Defendant Raymond in No. 03cr2066 MV was referred to the ATF for federal prosecution in the first place, but he believed that it was assigned to Agent Foutz by an ATF supervisor, who apparently received the referral from some other agency such as APD. [Id. at 92-93.]

FBI Special Agent Griego testified that he was the one who referred Detective Hubbard to ATF Agent Jessen in November 2004.  Agent Griego testified that he first met Detective Hubbard through a "cold call" the agent initiated earlier in the month of November 2004 while engaged in a "general canvassing" for information concerning alleged Aryan separatist groups, including the Aryan Brotherhood.  But Special Agent Griego did not meet or contact Mr. Valencia during that time frame, because the agent was working with a different group of attorneys in the Las Cruces, New Mexico division of the USAO.  [Id. at 95-96, 98.]

While Special Agent Griego and Agent Jessen both testified that they first learned about and joined the law-enforcement investigation into the disappearance of Mr. George in November 2004, such testimony does not preclude a reasonable inference that other personnel in the USAO and in federal law enforcement agencies could have--and did--learn about the investigation into Mr. George's disappearance before Defendant Raymond entered his plea agreement in No. 03cr2066 MV on October 14, 2004.  For example, the fact that Agent Jessen forwarded certain police reports to Mr. Valencia for the first time in November 2004 does not mean that Mr. Valencia or others in the USAO had no access to the information contained in those reports before that date.  Among the reports that Agent Griego and Agent Jessen received from Detective Hubbard in November 2004 was the same APD report regarding the arrest of Defendant Raymond and Ms. Robinson on June 29, 2002, that was included in the discovery materials that Mr. Valencia produced to Mr. Gonzales in No. 03cr2066 MV on December 2, 2003.  [Ex. 2, Ex. 8 to Doc. 380.]  While that APD report does

not specifically reference Ms. Robinson's involvement in the investigation of Mr. George's disappearance, one of the authors of that report (Officer Power) had a conversation about Ms. Robinson with RRDPS Lieutenant Noel Adams that is documented in Lieutenant Adams' supplemental report regarding the investigation of Mr. George's disappearance. [Ex. 2 to Doc. 377-3.] As Officer Power was the one who first discovered a firearm in Defendant Raymond's possession on June 29, 2002, it was obvious that he was going to be a primary fact witness for the Government in No. 03cr2066 MV. Indeed, Mr. Valencia specifically mentioned Officer Power by name when reciting the factual basis for Defendant's guilty plea in No. 03cr2066 MV on October 14, 2004. [Ex. 2 to Doc. 308, Tr. 10-14-04, at 15-19.] By interviewing him as part of routine discovery or trial preparation, the USAO or ATF case agent readily would have learned of Officer Power's communications with Lieutenant Adams and made the connection among Defendant Raymond, Ms. Robinson, the investigation into Mr. George's disappearance, and the alleged racketeering activities of the Aryan Brotherhood.

When the motion hearing reconvened on January 5, 2009, the Government withdrew its prior objections to calling Mr. Valencia as a witness and also withdrew its prior invocation of the Touhy regulations with respect to the production of the RRPDS files regarding Mr. George's disappearance and the USAO's files regarding Mr. Valencia's prosecution of Defendant Raymond in No. 03cr2066 MV. Instead, the Government produced redacted versions of these files to Defendant Raymond's counsel and asked the Court to conduct an in camera review of the propriety of such redactions.

In his testimony at the hearing on January 5, 2009, Mr. Valencia acknowledged that he prepared a proposed plea agreement and submitted it to Defendant Raymond's counsel on April 28, 2004.  The plea agreement contained what Mr. Valencia described as a mere "boilerplate provision" that was drafted and consistently used by the USAO; this provision stated that the USAO "will not bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico."[2] [Ex. 1 to Doc. 308, at 5.]  Mr. Valencia further acknowledged that on October 14, 2004, Defendant Raymond entered a guilty plea pursuant to a plea agreement containing that same provision proposed and drafted by the USAO.  According to Mr. Valencia, it was his understanding at the time he entered into the plea agreement that this provision was only meant to cover the offense conduct for June 29, 2002, *i.e.*, the day Defendant Raymond was arrested for possessing the firearm that is the subject of the indictment in No. 03cr2066 MV, even though there was no express language to this effect in the plea agreement and Mr. Valencia never told Mr. Gonzales or Defendant Raymond of this understanding.  [Doc. 497, Tr. 1-5-09, at 7-9, 13-16, 41-42.]

Mr. Valencia testified that he was "made aware of" information regarding Defendant Raymond's "connection to a missing person" **after** Defendant Raymond's guilty plea in 2004, but he did not remember exactly how he was made aware of such information.   Mr.

---

[2]As discussed later in this *Memorandum Opinion and Order*, the Court takes judicial notice that the USAO uses plea agreements which contain language that varies from the "boilerplate" identified by Mr. Valencia, and the language used by federal prosecutors in other districts is not uniform with respect to this issue.

Valencia did recall, however, that he had a conversation with ATF Agent Paul Jessen in which he asked Agent Jessen to get him some reports. According to Mr. Valencia, such reports were then faxed to him on November 10, 2004, and he later forwarded him to Mr. Gonzales (Defendant Raymond's counsel in No. 03cr2066 MV) on December 8 or December 9, 2004. [Doc. 497, Tr. 1-5-09, at 9-11.]

In response to cross-examination and questions from the Court, Mr. Valencia stated that he *did not recall* any conversations with Mr. Gonzales prior to the plea hearing in October 2004 concerning Defendant Raymond's involvement or possible involvement in the suspected murder in Rio Rancho. [Id. at 34-35.] Mr. Valencia did acknowledge, however, that at the time he was contemplating bringing the felon-in-possession charge in No. 03cr2066 MV, he knew that "they had tried to pass some checks . . . from Wells Fargo" and was concerned that there was "some kind of organized fraud going on." But he didn't pursue the fraud charges and interpreted the plea agreement as precluding the USAO from subsequently charging Defendant Raymond with "[c]onspiracy to commit the fraud" that allegedly occurred on June 29, 2002. [Id. at 28, 35-36, 39.]

The Court finds that by the time the pre-plea pre sentence report was disclosed in No. 03cr2066 MV (on July 8, 2004, a date well in advance of the change of plea hearing held on October 14, 2004), Mr. Valencia also must have known of Defendant Raymond's reported association with the Aryan Brotherhood. However, Mr. Valencia attempted to minimize this knowledge by testifying that Defendant Raymond's association with the Aryan Brotherhood was not significant to him. In this regard, Mr. Valencia explained that: "A lot of times the

agencies will tell you, 'Well, he's a member of this gang.  He's a member of that.'  And a lot of times that's just a reason to sell the case to us."  [Id. at 29; see also id. at 35-36, 38-39.] Further, while the "Form 13" pre-plea pre-sentence report made an obvious reference to Defendant Raymond's involvement in the Aryan Brotherhood, Mr. Valencia testified that he deemed that information unimportant.[3]

With regard to the procedure by which agencies would "sell" a case to the USAO for federal prosecution, Mr. Valencia further explained that "Project Exile," as referenced in one of the APD reports regarding Defendant Raymond's arrest on June 29, 2002 [Ex. 2 to Doc. 380], involved a series of monthly meetings between the USAO and the District Attorney's Office in Bernalillo County.  At such meetings, those in attendance would go over reports for the purpose of identifying cases which warranted federal prosecution by the USAO or further follow up by the ATF.  According to Mr. Valencia, "Project Exile" also involved instances where "the local police department would call ATF and ask them to present the case to the U.S. Attorney's Office." In addition, there was a "Violent Crime Impact Task Force, where the ATF was embedded into a task force that APD had." [Doc. 497, Tr. 1-5-09, at 33.]  Mr. Valencia stated that he was "not sure" whether he discussed any charges or criminal history relating to Defendant Raymond's arrest on June 29, 2002, with the District Attorney's Office, but he acknowledged that reports relating to that arrest might have been

---

[3]As explained later in this *Memorandum Opinion and Order*, information concerning Defendant Raymond's gang affiliation and his involvement in a larger conspiracy to commit "organized fraud" is of great significance, because this type of conduct relates to the essential elements of any conspiracy or racketeering charges that the USAO might wish to bring against this Defendant.

brought to his attention during one of the "Project Exile" meetings.  [Id. at 43-44.]  The APD

report cited above indicates more definitively that the information contained therein *was* sent

to the USAO through "Project Exile," as it affirmatively states that charges "would be

forthcoming from the U.S. Attorneys Office" as a result of this communication.  [Ex. 2 to

Doc. 380, at Bates No. 000034.]

At the conclusion of Mr. Valencia's testimony at the hearing on January 5, 2009, the

parties indicated they had no further evidence to present but requested the opportunity to

submit supplemental briefing.  The transcript of that hearing was filed and made available

to counsel on January 6, 2009 [Doc. 497], and the parties each filed a supplemental brief on

January 15, 2009.  [Doc. 502, 503.]

## II.   ANALYSIS

### A.   Defendant Raymond's Motion to Dismiss

Our criminal-justice system encourages plea-bargaining, in which criminal defendants

agree to plead guilty to one or more offenses in exchange for promises by the government

with respect to sentencing and additional charges.  Although defendants may waive or forfeit

several important rights as a result of pleading guilty, the fact that they admit committing a

serious crime, or stand accused of committing more serious crimes, does not necessarily

mean that they lose the ability to obtain the benefits for which they bargained in their plea

agreements with the government.  On the contrary, such plea bargains can become legally

enforceable contracts that bind both the defendant and the government, and the law requires

the government to keep the promises it has made in a plea agreement after a defendant pleads guilty in accordance with the agreement.

In this case, Defendant Raymond asks the Court to enforce his plea agreement in No. 03cr2066 MV by dismissing the present charges against him in No. 07cr748 MCA. Defendant Raymond's motion to dismiss presents both a factual question and a legal question.  The legal question is whether any of the present charges contained in the *Superseding Indictment* fall within the scope of the USAO's promise in the earlier plea agreement that it "will not bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico."  [Ex. 1 to Doc. 308, at 5.]  The factual question is whether or to what extent the USAO knew about the ongoing investigations of Defendant Raymond's conduct in relation to the disappearance of Henry George, the attempted murder of [name redacted], the racketeering activities of the Aryan Brotherhood, and/or Defendant Raymond's involvement in that organization at the time the parties entered into the plea agreement in No. 03cr2066 MV.

In essence, from the Defendant's perspective, the contractual terms of the plea agreement should be strictly enforced.  From the government's perspective, the language at issue, though undisputedly written with the broad stroke of a pen, constitutes mere "boilerplate" language, carrying no special or significant meaning.  From my review, I conclude that the language of the plea agreement at issue here is not mere "boilerplate" language or "legalese."  Rather, it is the very essence of the agreement.

Therefore, for the reasons set forth below, I find by a preponderance of the evidence that the USAO did have knowledge of the conduct described above and that such knowledge was timely and sufficient enough to invoke the provision in Defendant Raymond's plea agreement which precludes the USAO from bringing additional charges arising out of that conduct. I also determine that the provision of the plea agreement at issue here is worded broadly enough to encompass the present charges against Defendant Raymond and that he reasonably understand this provision to preclude the USAO from filing such charges against him. Under these circumstances, I conclude that Defendant Raymond has met his burden of establishing the grounds upon which the present charges against him must be dismissed without prejudice.

### 1.    Standard of Review

While the Court's determination of the nature and extent of the government's obligations under a plea agreement is generally guided by principles of contract law,  see United States v. Cachucha, 484 F.3d 1266, 1270 (10th Cir.2007), such a determination also is informed by constitutional and supervisory concerns which can, in some instances, require a court to hold the government to a higher standard than a private contractor, see 5 Wayne R. LaFave et al., Criminal Procedure §21.2(d), at 602-04 (3d ed. 2007). Because important due-process rights are involved, the Court cannot rely on the government's unilateral declarations as to whether a breach of the plea agreement has occurred. See  United States v. Guzman, 318 F.3d 1191, 1196-97 (10th Cir. 2003). Rather, "[i]f the pleadings reveal a factual dispute on the issue of breach, the district court must hold a hearing to resolve the

factual issues," and provide the defendant with "an adequate opportunity to respond to the government's pleadings on the issue of breach." United States v. Calabrese, 645 F.2d 1379, 1390 (10th Cir. 1981).

At such a hearing, "the party who asserts a breach of a plea agreement has the burden of proving the underlying facts that establish a breach by a preponderance of the evidence." Allen v. Hadden, 57 F.3d 1529, 1534 (10th Cir. 1995). When, as here, a defendant asserts a breach of a plea agreement based on allegations which may require the discovery of information or evidence in the possession of the government or its agents, the Defendant may meet his burden of proof without producing "*direct* evidence" such as written admissions that "explicitly mention" the breach. Id. at 1537. Under these circumstances, a defendant may instead use "indirect evidence" to support an inference that the plea agreement was breached, "even though he can identify no 'smoking gun.'" Id.

If Defendant Raymond meets his burden of proving by a preponderance of the evidence that the USAO had the requisite knowledge of the conduct from which present charges arise, and if such knowledge brings any of the present charges within the scope of the USAO's promise in the earlier plea agreement, then as a matter of law that promise is enforceable against the USAO. In this regard, our Supreme Court has long held that where the government obtains a guilty plea that "rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled" to maintain the integrity of the plea. Santobello v. New York, 404 U.S. 257, 262 (1971). The Tenth Circuit has similarly

concluded that "[b]ecause a government that lives up to its commitments is the essence of liberty under law, the harm generated by allowing the government to forego its plea bargain obligations is one which cannot be tolerated." United States v. Brye, 146 F.3d 1207, 1210 (10th Cir.1998) (internal quotation marks and citations omitted).  In more practical terms, "[i]t is critical that the government stand by its agreements . . . in order to encourage plea bargaining." United States v. Cooper, 70 F.3d 563, 567 (10th Cir. 1995).

The duty of the government to "live up to its commitments" continues after a plea agreement is accepted and a defendant appears for sentencing.  In this regard, the Tenth Circuit has explained that:

> The prosecutor has many ethical duties, including ethical duties of deciding what charges to bring and what plea agreements to make. When those agreements are made with full knowledge of the facts at hand, those agreements should be . . . "fulfilled to maintain the integrity of the plea," not to mention the integrity of the government. If at a later date the government discovers facts that cause it to believe that its prosecutorial discretion was not properly exercised, it has the ethical obligation to withdraw from the plea agreement and advise the defendant so that he or she may prepare for trial or renegotiate. It is certainly not proper for the government to wait until the sentencing hearing then breach the terms of the plea agreement, shielding its behavior by claiming its obligation to be an ethical officer of the court.

Cooper, 70 F.3d at 567 (quoting United States v. Hand, 913 F.2d 854, 856 (10th Cir. 1990)); accord United States v. Hawley, 93 F.3d 682, 693 (10th Cir. 1996).  Similarly, the government cannot avoid its obligations under a plea agreement by "rely[ing] upon a 'rigidly literal construction of the language' of the agreement, nor may it accomplish 'through indirect means what it promised not to do directly.' " Hand, 913 F.2d at 856 (quoting United States v. Shorteeth, 887 F.2d 253, 256 (10th Cir.1989)).

### 2.   **Interpreting the Terms of the Plea Agreement**

With these principles in mind, the Court "look[s] first to the express terms of the agreement."  United States v. Werner, 317 F.3d 1168, 1170 (10th Cir. 2003) (citing Brye, 146 F.3d at 1210).  Under principles of contract law, effect must be given to every provision of an agreement, see Parker v. United States, 448 F.2d 793, 797 (10th Cir.1971), and it must be construed as a whole, see FDIC v. Canfield, 967 F.2d 443, 446 (10th Cir.1992).  "It is a cardinal rule of construction ... that effect should be given, if possible, to every word, phrase, clause, and sentence."  Salt Lake County v. Utah Copper Co., 93 F.2d 127, 133 (10th Cir.1937).

Accordingly, the Court must examine each of the relevant words and phrases in Defendant Raymond's plea agreement in No. 03cr2066 MCA to determine their meaning and context.  The section of the plea agreement in dispute is entitled "Government's Agreement," and it sets forth the government's promises as follows:

> 10.   Provided that the defendant fulfills his obligations as set out above, the United States agrees that:
>
> a.   The United States will not bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico.
>
> 11.   This agreement is limited to the United States Attorney's Office for the District of New Mexico and does not bind any other federal, state, or local agencies or prosecuting authorities.

[No. 03cr2066 MV, Doc. 45, attached as Ex.1 to Doc. 308 in No. 07cr748 MCA.]

Other courts have interpreted plea agreements which define the scope of a prosecutor's promise not to file other charges, but most of the reported case law interpreting these types of agreements is directed at disputes over whether such promises extend to other agencies or the government as a whole. See, e.g., Allen, 57 F.3d at 1535 (citing United States v. Harvey, 791 F.2d 294 (4th Cir. 1986)). There is no such dispute here, as the language of Defendant Raymond's plea agreement in No. 03cr2066 MV expressly provides that the USAO's promises do "not bind any other federal, state, or local agencies or prosecuting authorities."

This limiting language does not end the Court's inquiry, for it is also beyond dispute that the United States Attorney's Office for the District of New Mexico (USAO) is the same federal agency that has brought additional charges against Defendant Raymond in the *Superseding Indictment* filed in the present case (No. 07cr748 MCA). Thus, the plea agreement's reference to "additional charges against the defendant" was meant to encompass the type of charges that have been filed against Defendant Raymond in the present case, *i.e.*, charges brought by the USAO.

Whether the plea agreement precludes the USAO from bringing these additional charges depends on whether they "aris[e] out of conduct . . . known to" the USAO at the relevant time. Other courts have grappled with similar questions about whether a particular charge is encompassed by a prosecutor's earlier promises in a plea agreement. See, e.g., United States v. Jordan, 509 F.3d 191, 195 (4th Cir. 2007) (interpreting a plea agreement in which the government promised not to "further criminally prosecute" a defendant "for the

specific conduct described in the indictment or statement of facts"); <u>United States v. Grap</u>, 368 F.3d 824, 827 (8th Cir. 2004) (interpreting a plea agreement in which the government promised not to "further prosecute" a defendant "based on the information and evidence now available to the United States regarding [his] involvement with regard to the two factual scenarios underlying the two counts of the indictment"); <u>United States v. Clark</u>, 218 F.3d 1092, 1094 (9th Cir. 2000) (interpreting a plea agreement in which the government promised that "no other charges will be filed against defendant in connection with this investigation").

The relevant language in Defendant Raymond's plea agreement in No. 03cr2066 MV is broader and more ambiguous than the language at issue in the cases cited above, because it does not limit the USAO's promise to specific conduct described in a particular document or to charges arising from a particular investigation or factual scenario. Rather, the plea agreement at issue here precludes additional charges arising out of *all* conduct known to the USAO at the relevant time.

### 3.    The Scope of Conduct "Now Known To" the USAO

In order to resolve the ambiguity entailed by this broad language, the Court must determine what is meant by the phrase "now known to" the USAO. In his supplemental brief [Doc. 502], Defendant Raymond asserts that the word "now" in this phrase should refer to the date of his sentencing, at which time Judge Vazquez accepted the plea agreement. If the Court were to construe the plea agreement in this manner, then there is no question that the USAO knew of the written reports detailing Defendant Raymond's alleged involvement in Mr. George's disappearance by that date, because Mr. Valencia specifically referenced those

reports at the sentencing hearing and in his sentencing correspondence with the Court and opposing counsel in No. 03cr2066 MV.  The Government, however, contends that the word "now" in Defendant Raymond's plea agreement instead refers to October 14, 2004, the date on which he signed the plea agreement and entered his plea of guilty in No. 03cr2066 MV.

The weight of authority supports the Government's view that October 14, 2004, should be used as the relevant date for purposes of determining the parties' knowledge and understanding of the plea agreement.  See Brye, 146 F.3d at 1210 (construing terms of a plea agreement "at the time the guilty plea was entered"); Grap, 368 F.3d at 827-28 (construing the word "now" as "the effective date of the plea agreement" and noting the dates on which the plea agreement was signed and filed, as well as the date on which the defendant pleaded guilty); United States v. Sutton, 794 F.2d 1415, 1422-23 (9th Cir. 1986) (determining the state of the government's knowledge as of the date on which the defendant pleaded guilty).  While Defendant has submitted contrary authority suggesting a temporal distinction between a court's acceptance of a defendant's *guilty plea* and a court's acceptance of a *plea agreement*, see D.N.M. LR-Crim. 11.2; United States v. Hyde, 520 U.S. 670, 674 (1997), such authority is not persuasive in this context because a federal court's role with respect to accepting a plea agreement is primarily directed at extra-contractual concerns that arise under the Due Process Clause, such as ensuring that a defendant's plea is knowing and voluntary in accordance with Fed. R. Crim. P. 11.  Cf. 5 Wayne R. LaFave *et al.*, Criminal Procedure, supra, §21.2(d), at 602-04 (discussing the due-process aspects of plea bargaining).  Apart from ensuring that a defendant receives the process that is due under this rule, federal courts

take no active role in the negotiation or formation of a plea agreement.  See id. § 21.3(d), at 746-47 (citing Fed. R. Crim. P. 11(c)(1)).

In the circumstances presented here, I therefore conclude that any contingencies related to obtaining final court approval of the plea agreement do not preclude the parties from forming an enforceable contract that was meant to become binding with respect to the USAO's knowledge as of October 14, 2004, the date by which both parties signed the plea agreement and Defendant Raymond entered his plea of guilty pursuant to that agreement. It would be illogical to hold that the Government's promises in a plea agreement do not take effect until the time that a court finally accepts the plea agreement at the conclusion of a sentencing hearing, because many of those promises concern what the Government is going to do *before* or *during* the sentencing hearing (*e.g.*, recommend a lower sentence or allow a defendant to argue for a downward departure).  To the extent that such a promise is intended to account for contingencies that occur after the signing of the agreement or the entry of the guilty plea, one would expect the plea agreement to contain specific language in that regard (*e.g.*, references to what the parties have bargained for with respect to a subsequent appeal or in the event that new information arises in a pre-sentence report).  See, e.g.,United States v Balderrain, No. 08-8016, 2009 WL 205631 (10th Cir. Jan. 29, 2009) (unpublished order and judgment citing a plea agreement that made the Government's promises effective "once the state court accepts Mr. Belderrain's plea agreement").  The provision of Defendant Raymond's plea agreement in No. 03cr2066 MV at issue here lacks such a specific reference to a subsequent time period, and for the reasons set forth above, I conclude that the effective

date for purposes of determining the parties' knowledge and understanding of the agreement is October 14, 2004.

This conclusion does not end the Court's inquiry, for there is plenty of evidence in the record from which to draw the inference that the USAO knew *before that date* of conduct by Defendant Raymond that gave rise to the present charges in No. 07cr748 MCA.  To defeat this inference, the Government asks the Court to adopting a rigidly literal construction of the term "known," such that the USAO's promises in Defendant Raymond's plea agreement in No. 03cr2066 MV apply only to the extent that the USAO knew "for sure" that Defendant Raymond committed each element of a particular crime (such as murder or kidnapping) at the time the plea agreement was signed.  Mr. Valencia's testimony at the hearing on January 5, 2009, goes a step further and asks the Court to interpret the plea agreement in light of Mr. Valencia's assumption or understanding that the language in question applies only to conduct that occurred during the incident leading to Defendant Raymond's arrest on June 29, 2002, even though such an assumption or understanding was never communicated to Defendant Raymond or his counsel at the time the plea agreement was signed.

I reject such narrow interpretations of Defendant Raymond's plea agreement because they fail to account for his alleged conduct in relation to *all* elements of the crimes charged in the present case and are contrary to established precedent in this circuit.  See Hand, 913 F.2d at 856; Shorteeth, 887 F.2d at 256.  In this context, our Tenth Circuit has repeatedly stated that ambiguities in a plea agreement are to be construed against the drafter of the

agreement.  See, e.g., Cachucha, 484 F.3d at 1270; Werner, 317 F.3d at 1170; Guzman, 318 F.3d at 1195; Brye, 146 F.3d at 1210.

The evidence submitted in response to Defendant Raymond's *Motion to Dismiss* [Doc. 308] in the present case indicates that the Government was the drafter of the plea agreement in No. 03cr2066 MV.  The language now at issue first appeared in the draft that Mr. Valencia submitted to Defendant Raymond's counsel on or about April 28, 2004, and there is no indication that Defendant Raymond or his counsel sought or were given the option of changing this language.  [Ex. 4 to Doc. 380.]  While the Court acknowledges Mr. Valencia's testimony that the language used in Defendant Raymond's plea agreement is consistent with what the USAO has used in other cases, see, e.g., United States v. Trujillo, 537 F.3d 1195, 1197 n.2 (10th Cir. 2008), I also find that Mr. Valencia was incorrect in suggesting that such language is "boilerplate" that uniformly appears in all of the USAO's plea agreements.

In this regard, I note that the USAO has added other provisions to its plea agreements when it wishes to limit the scope of the promise at issue here.  For example, the USAO used different language in its plea agreement with Ms. Robinson, the same individual who was arrested with Defendant Raymond during the incident at the car dealership on June 29, 2002. See, e.g., United States v. Robinson, No. 05cr1321 JEC, Doc. 27 (D.N.M. plea agreement filed May 17, 2006) (agreeing "not to bring additional charges against the defendant arising out of the defendant's conduct now known to the United States Attorney's Office for the District of New Mexico, **with the exception of any and all participation in crimes of violence**") (emphasis added).  I also note that United States Attorneys in other districts use

different language to describe their promises with respect to not bringing additional charges. See, e.g., Jordan, 509 F.3d at 195 (limiting the scope of this promise to "the specific conduct described in the indictment or statement of facts"); Grap, 368 F.3d at 827 (limiting the scope of this promise to "the two factual scenarios underlying the two counts of the indictment"); Clark, 218 F.3d at 1094 (limiting the scope of this promise to "this investigation").  Because the USAO was the drafter of Defendant Raymond's plea agreement in No. 03cr2066 MV and there was no restriction on its ability to limit the scope of its promises as noted in the examples provided above, I conclude that the ambiguities in this plea agreement are to be construed against the USAO.

In further analyzing the terminology used in Defendant Raymond's plea agreement, the Court must view such terms "in light of the *defendant's* reasonable understanding of the promise at the time the guilty plea was entered." Brye, 146 F.3d at 1210 (emphasis added); accord United States v. Van Dam, 493 F.3d 1194, 1199 (10th Cir.2007).  Accordingly, the Court may look to statements made at the change-of-plea hearing to illuminate the parties' understanding of the plea agreement, see, e.g., Brye, 146 F.3d at 1212, or analyze statements made at sentencing to determine a party's intentions with respect to complying with the agreement, see, e.g., Cachucha, 484 F.3d at 1270.  In this instance, I find it noteworthy that Defendant Raymond's plea agreement contains no promises by the USAO as to a particular sentence that he would receive in No. 03cr2066 MV.  Rather, the type of plea agreement at issue here places more focus on a "plea of guilty to one charge in exchange for the

prosecutor's promise to drop or not to file other charges."   5 Wayne R. LaFave *et al.*, Criminal Procedure, supra § 21.1(a), at 522.

With respect to sentencing, Judge Vazquez ordered the United States Probation Office to investigate and prepare a "Form 13" pre-plea pre-sentence report; the parties then proceeded to litigate whether Defendant Raymond was still subject to a mandatory minimum sentence under the Armed Career Criminal Act (ACCA), 18 U.S.C. § 924(e)(1), given our Supreme Court's ruling in Blakely v. Washington, 542 U.S. 296 (2004), and its progeny. Because Defendant Raymond's sentence depended on the applicability of the *mandatory* provisions of the ACCA, the "acceptance of responsibility" points that he earned from pleading guilty, as well as the Government's promise to recommend the lower end of the appropriate guideline range, did not play as big a role as they normally would in a case that turns on a *discretionary* application of the United States Sentencing Guidelines.

Under these circumstances where the Court's sentencing options are quite limited, the promise of not filing "additional charges" takes on greater significance as the primary consideration that the USAO provided in exchange for Defendant Raymond's guilty plea to the charge of being a felon in possession of a firearm.   It was thus reasonable for him to understand this promise as more than just boilerplate technical language in his case.   Rather, it was the very essence of the agreement.

Such an understanding finds further support in the record of the hearings which preceded Defendant Raymond's guilty plea, when the USAO vigorously contested Judge Vazquez's decision to release Defendant Raymond on conditions.   During the hearing on the

motion which resulted in Defendant Raymond's pretrial release, for example, Mr. Valencia stated that "Mr. Raymond has a terrible criminal history . . . from 1994 to the present," evincing "repeated failures to comply with conditions of his State probation and his failure to comply with those conditions of release, plus the fact that he is a multiple convicted felon." At that hearing, Mr. Valencia further asserted "the facts are that he is a dangerous criminal" and "a violent criminal" who "is a danger to the community." [Ex. 15 to Doc. 401, Tr. 5-4-04, at 11-14.]  While Mr. Valencia did not present specific evidence in support of these contentions at that time, his remarks could reasonably lead Defendant Raymond to believe that the USAO did in fact know of other conduct which could give rise to additional charges if he did not accept the plea offer.

Although it does not specifically mention the investigation of the Henry George matter, the pre-plea pre-sentence report that Defendant Raymond reviewed before pleading guilty in No. 03cr2066 MV also supports a reasonable belief on his part that the USAO had extensive knowledge of his criminal history and background which could be used to bring additional charges if he did not sign the plea agreement.  In this regard, Defendant Raymond credibly testified at the hearing on October 24, 2008, that he assumed "the government knows every single solitary thing including getting kicked out of the fourth grade." [Doc. 416, Tr. 10-24-08, at 51-52, 56.]

Construing the broad language in the plea agreement in light of the Defendant's reasonable understanding at the time the guilty plea was entered, I further conclude that the USAO's promise not to bring additional charges against Defendant Raymond is not limited

to crimes occurring on a single date or specific offenses for which the USAO had certain knowledge as to each essential element at the time the plea agreement was accepted.  As noted above, I reject Mr. Valencia's assumption or unilateral understanding that the plea agreement was limited to conduct occurring on June 29, 2002, because that assumption or understanding does not appear in the express language of the plea agreement and was never communicated to Defendant Raymond or his counsel.  Thus, it does not provide a basis for the *Defendant's* reasonable understanding of the agreement at the time it was entered.  See Brye, 146 F.3d at 1210.

Further, such a narrow interpretation of the plea agreement fails to account for alternative connotations of the verb "to know."  As noted in the dictionary definition cited in the government's response brief, the term "knowledge" has several meanings, each of which may imply a different degree of certainty.  At one end of the spectrum, the term "knowledge" may refer to a specific mental state which is required to render a witness competent to testify about a matter in accordance with the Federal Rules of Evidence, or which must be proven beyond a reasonable doubt to convict a defendant of a particular crime.  Such use of the term would not make sense in the context presented here, because the standard of proof is a preponderance of the evidence, see Allen, 57 F.3d at 1534, and the plea agreement refers to the knowledge of the USAO as a whole rather than a single individual who works there.  Under these circumstances, it would be an empty and illusory promise merely to guarantee that the USAO will not prosecute a defendant for conduct of which a particular prosecutor within that office has direct, personal knowledge as an eyewitness.

-41-

In the context presented here, it is more reasonable to infer that the reference to the USAO's "knowledge" in the plea agreement was meant to include the results of an investigation reported to that agency by a witness or third party.  See, e.g., Sutton, 794 F.2d at 1424 (concluding that the government had "actual knowledge" that a defendant had purchased a cashier's check when a bank teller "tentatively identified a photograph of [the defendant] as the person who had purchased the check"); id. at 1424-25 (concluding that the government had "actual knowledge" that a defendant transported a particular load of marijuana when a fellow inmate of the defendant told a government agent that the defendant had admitted doing so).  Such use of the verb "to know" is consistent with ordinary dictionary definitions such as "to have acquaintance or familiarity with through experience or acquisition of information or hearsay," or simply "to have information."  2 Webster' Third New International Dictionary 1252 (1981).

Because the plea agreement refers to conduct "known to" the USAO rather than a particular individual, it is also reasonable to construe the agreement as covering all information acquired by the USAO as a whole, regardless of whether such information was actually communicated from one individual within the office to another.  In this regard, our Supreme Court has determined that "[t]he staff lawyers in a prosecutor's office have the burden of 'letting the left hand know what the right hand is doing' or has done.  That the breach of agreement was inadvertent does not lessen its impact."  Santobello, 404 U.S. at 499.  Thus, the knowledge of one prosecutor may be attributed to other staff members in the USAO even though such an attribution may have unintended consequences.  See Giglio v.

United States, 405 U.S. 150, 154-55 (1972).  The USAO is charged with "'knowledge of the facts *at hand*,'" even if through some inadvertent mistake the prosecutor handling the plea negotiations is not personally familiar with the results of an investigation monitored by another staff member within the office.  Hawley, 93 F.3d at 693 (quoting Cooper, 70 F.3d at 567).  To hold otherwise would allow the USAO to "accomplish 'through indirect means what it promised not to do directly,'" Id. at at 692 (quoting Hand, 913 F.2d at 856), for it would allow the USAO to avoid its obligations under the type of plea agreement at issue here by dividing its responsibilities so that prosecutors involved in plea negotiations are screened from investigations communicated to other staff members.

This conclusion does not mean that the USAO is charged with constructive knowledge of every fact that any federal, state, or local government official *could have known* at the relevant time through more diligent and careful investigation.  "[T]he words 'conduct known to the government' cannot be fairly construed as 'conduct that reasonably could have been known'" to the government if its investigation had been more timely or thorough.  Sutton, 794 F.2d at 1423.  While allegations of unreasonable pre-indictment delay in investigating a matter may raise due-process concerns of their own, see, e.g., Grap, 368 F.3d at 829, such concerns do not transform the language of the plea agreement at issue here into a negligence standard that can be used to hold government agencies accountable for not pursuing a more diligent or careful investigation at the time the plea agreement was accepted.

### 4.    The Distinction Between "Crimes" and "Conduct"

Nevertheless, the scope of the actual knowledge at issue here is still quite broad because Defendant Raymond's plea agreement in No. 03cr2066 MCA is not limited to a particular "crime" or "additional charges" that were known to the USAO.  Rather, the plea agreement refers to *"conduct"* known to the USAO.

The term "crime," which does not even appear in this section of the plea agreement, "is a much narrower concept than 'conduct.'"  Jordan, 509 F.3d at 196.  "Crime" is a legal term of art which the dictionary defines as "'act that the law makes punishable,'" and which requires proof of a combination of specific elements.  Id. (quoting Black's Law Dictionary 399 (8th ed. 2004)).  "Conduct, in contrast, is 'personal behavior, whether by action or inaction' and is a term that transcends the legal context."  Id. (quoting Black's Law Dictionary, supra, at 315).  Crimes are analytically and conceptually distinct from conduct because a given instance of conduct may cause a person to be liable for multiple crimes, and a given crime may require proof of several distinct instances of conduct.  See id.  Thus, in construing the plea agreement, it is important to avoid conflating the word "conduct" with the word "crime."

Here the plea agreement refers to charges "arising out of" Defendant Raymond's conduct.  The phrase "arising out of" has a variety of meanings which are dependent on its context.  See 1 Webster's Third New International Dictionary 117 (1981) (listing eight separate definitions for the word "arise").  In the context presented here, this phrase is used in a historical or causal sense, meaning "to originate from a specified source."  Id.

For these reasons, the applicability of the USAO's promise not to bring additional charges against Defendant Raymond does not hinge on whether the USAO knew at a particular time that he committed each and every element of a particular *crime* such as "murder" or "kidnapping."   See id. at 197-98.   Rather, Defendant Raymond's motion to dismiss calls for an inquiry as to whether *any* of the essential elements of the "additional charges" the USAO brought against him in No. 07cr748 MCA *originate from* conduct known to the USAO at the time stated in the plea agreement.   See Jordan, 509 F.3d at 197-98.

This inquiry is quite expansive because Defendant is charged in the present case with committing violent crimes in aid of racketeering (VCAR) under 18 U.S.C. § 1959(a), and this statute has several distinct elements which may encompass more than one instance of conduct.   "Congress enacted § 1959 to complement the [RICO] Act . . . by making it a federal crime to commit violent acts for the purpose of maintaining or increasing one's position within a RICO enterprise."   United States v. Crenshaw, 359 F.3d 977, 984 (8th Cir. 2004); accord United States v. Mapp, 170 F.3d 328, 335 (2d Cir. 1999).

The VCAR statute covers two different purposes for which violent crimes may be committed in aid of racketeering: (1) "murder for hire" or "quid pro quo" crimes, in which a defendant received something of pecuniary value from the racketeering enterprise in exchange for carrying out the underlying offense, and (2) "status crimes," in which a defendant commits a violent crime in order to maintain or increase his or her position within a criminal organization.   See 18 U.S.C. § 1959(a); United States v. Fernandez, 388 F.3d 1199, 1232 (9th Cir. 2004).   The *Superseding Indictment* in this case alleges both of these

purposes in the conjunctive, although at trial the Government may seek a conviction on either ground.

Based on the record developed thus far, it appears that the Government is going to proceed on a theory that the murder and kidnapping of Mr. George, as well as the attempted murder of [name redacted], were "status crimes" committed for the purpose of maintaining or increasing the Defendants' positions within a particular faction of the Aryan Brotherhood. If the Government does proceed on a theory that the kidnapping, murder, and attempted murder alleged in the *Superseding Indictment* were "status crimes," then to obtain convictions under the VCAR statute, the Government must prove the following elements at trial:  (1) the defendant committed the violent crime(s) of murder, kidnapping, attempted murder, and/or conspiracy; (2) there was a criminal organization, *i.e.*, the Aryan Brotherhood, that meets the statutory definition of an "enterprise," (3) the enterprise was engaged in or its activities affected interstate or foreign commerce, (4) the Aryan Brotherhood was engaged in racketeering activity during the time period in question, (5) the Defendant had or sought a position in the Aryan Brotherhood, and (6) the Defendant's general purpose in committing the violent crime at issue was to gain entrance to, or to maintain or increase his position in, the Aryan Brotherhood.  See United States v. Smith, 413 F.3d 1253, 1277 (10th Cir. 2005); Fernandez, 388 F.3d at 1219-20; Crenshaw, 359 F.3d at 991.  As the Court recently emphasized in its *Memorandum Opinion and Order* regarding the parties expert witnesses [Doc. 513], these elements must be proven at trial through

evidence of specific conduct, rather than through the conclusory opinions of a case agent.
See United States vs. Mejia, 545 F.3d 179, 190-99 (2nd Cir. 2008).

Thus, for purposes of defining the scope of conduct covered by Defendant Raymond's
plea agreement in No. 03cr2066 MV, the relevant inquiry is not limited to the commission
of the underlying violent crimes of murder, kidnapping, attempted murder, or conspiracy.
Rather, the "conduct" referenced in the plea agreement also may apply to other elements of
the VCAR statute, such as having or seeking a position in the Aryan Brotherhood or
involvement in that organization's racketeering activity apart from the underlying violent
crimes. See Jordan, 509 F.3d at 197-98 (concluding that the Government was precluded
from charging a defendant with committing a murder while engaged in a drug conspiracy
where the conduct entailed by the drug conspiracy was already covered by an earlier plea
agreement).

## 5.    The Timing of the USAO's Knowledge

Having rejected the Government's efforts to limit the broad language of the plea
agreement in No. 03cr2066 MV and disregard the numerous elements of the VCAR statute,
the Court next turns to the factual dispute concerning *when* the USAO first gained the
requisite knowledge of any conduct by Defendant Raymond from which an essential element
of the present charges arose or originated.  The most direct evidence on this point is Mr.
Gonzales' credible testimony that Mr. Valencia spoke to him about seeking Defendant
Raymond's cooperation in the Rio Rancho murder investigation at some time before
Defendant Raymond entered his guilty plea.  [Doc. 416, Tr. 10-24-08, at 37-38.]  Although

Mr. Gonzales could not recall the exact date or time at which Mr. Valencia first communicated this request for cooperation regarding the Rio Rancho murder investigation, I find Mr. Gonzales' testimony to be credible, and I further conclude that someone from the USAO (*e.g.*, Mr. Valencia) communicated to Mr. Gonzales a request for Defendant Raymond's cooperation in the Rio Rancho murder investigation before Defendant Raymond entered his guilty plea in No. 03cr2066 MV on October 14, 2004.   Implicit in this communication is the USAO's knowledge of reports or investigations (whether oral or written) describing evidence of Defendant Raymond's involvement in Mr. George's disappearance.

The timing of such a request for cooperation would be entirely consistent with the procedure prescribed in Section 9-27.420 of the *United States Attorney's Manual* (rev. 1997), which states that:  "In determining whether it would be appropriate to enter into a plea agreement, the attorney for the government should weigh all relevant considerations, including . . . [t]he defendant's willingness to cooperate in the investigation or prosecution of others."  There is evidence suggesting that it is a common practice of the USAO in the District of New Mexico to initially charge similarly situated Defendants with gun crimes and then solicit their cooperation before bringing additional charges or negotiating a plea agreement.

In the present case, for example, the USAO initially charged Defendant Wasson with a gun crime and then brought additional charges after a period of time.  The USAO also has charged [name redacted] and Ms. Robinson with gun crimes arising from the same set of

concurrent law-enforcement investigations, which resulted in plea agreements and anticipated cooperation. Special Agent Griego's testimony at the hearing on October 24, 2008, further indicates that it was his practice to refer matters to the Bureau of Alcohol Tobacco and Firearms (ATF) to determine whether there were any "uncharged gun violations" while his investigation into the broader criminal activities of an individual or organization continued. [Doc. 416, Tr. 10-24-08, at 96.] The police report and Mr. Valencia's testimony regarding "Project Exile" is also consistent with this practice. [Ex. 2 to Doc. 380; Doc. 497, Tr. 1-5-09, at 32-33, 43.]

The evidence of record supports a reasonable inference that the information concerning the nature and existence of the RRDPS investigation into Mr. George's disappearance, as well as Defendant Raymond's alleged involvement in that disappearance and related racketeering activity, was readily available to Mr. Valencia, others in the USAO, the ATF case agent in No. 03cr2066 MV, and the District Attorney's Office before the date of Defendant Raymond's plea agreement in that case. In stating the factual basis for Defendant Raymond's change of plea on October 14, 2004, Mr. Valencia specifically mentioned APD Officer Power and read verbatim from Officer Power's police report regarding Defendant Raymond's arrest on June 29, 2002. [Ex. 2 to Doc. 308-3; Tr. 10-14-04, at 15-19.] Thus, Officer Power was obviously going to be a key government witness in No. 03cr2066 MV. He is also the same individual who reportedly spoke with Ms. Robinson and Lieutenant Adams of the RRDPS about the investigation into Defendant Raymond's involvement with Mr. George's disappearance on that date. [Ex. 2 to Doc. 377, at 9-10.] By

speaking to his own witness, Mr. Valencia or the ATF case agent in No. 03cr2066 MV would have readily made the link to the RRDPS investigation detailing Defendant Raymond's alleged involvement in the disappearance of Mr. George.

Even if the USAO did not know "for sure" that each essential element of the crime of murder had been completed at that time, Mr. Gonzales' credible recollection of his conversation with Mr. Valencia necessarily entails knowledge on the part of the USAO with respect to the *conduct* of Defendant Raymond as it relates to Mr. George's disappearance. To further support this inference, Defendant Raymond has identified several instances in which one or more law enforcement officers were investigating or receiving information about his *conduct* relating to Mr. George's disappearance prior to the date on which he signed the plea agreement and entered his guilty plea in No. 03cr2066 MV. [Ex. 2 to Doc. 377, at 9-10; Ex. 3 to Doc. 377.]

I therefore find by a preponderance of the evidence that the additional charges brought against Defendant Raymond by way of the *Superseding Indictment* in No. 07cr748 MCA arise out of, or originate from, the reports of such conduct which appeared during the investigation that was ongoing and readily accessible to the USAO well before Defendant Raymond entered his guilty plea in No. 03cr2066 MV. For example, many of the overt acts listed in support of the conspiracy charged in Count 1 of the *Superseding Indictment* [Doc. 36] in No. 07cr748 MCA refer to events and items of evidence that were documented in the reports prepared by law enforcement officers during the early stages of the investigation. While there is no "smoking gun" confirming beyond doubt that the USAO received copies

of the *written* reports of these investigations before October 14, 2004, there is an abundance of indirect, circumstantial evidence to support a reasonable inference that the USAO knew of the information in such reports before that date; such indirect, circumstantial evidence is sufficient to meet Defendant Raymond's burden of proof on this issue.  See Allen, 57 F.3d at 1537.

All of the present charges against Defendant Raymond also reference his participation in the Aryan Brotherhood and allege that the listed crimes were committed to aid the goals of that organization.  Defendant Raymond's alleged participation in, and furtherance of the goals of, the Aryan Brotherhood were the subject of investigation and documented in reports prepared by law enforcement officers and probation officers before the effective date of his plea agreement in No. 03cr2066 MV.  Indeed, the very same incident that gave rise to the charges in No. 03cr2066 MV may form part of the "racketeering activity" that the Government attributes to the "Aryan Brotherhood" enterprise for purposes of sustaining the charges against Defendant Raymond under the "violent crimes in aid of racketeering statute" in No. 07cr748 MCA.

In this regard, the *Superseding Indictment* [Doc. 36] alleges that "[i]dentity theft and check fraud are the most prevalent non-violent crimes committed by the Aryan Brotherhood" [¶ 6], and that "[t]o generate income participants engage in illegal activities under the protection of the enterprise, including narcotics trafficking, fraud, trafficking in firearms, and other illegal activities" [¶ 16(f)].  The activities described by Mr. Valencia at Defendant Raymond's change-of-plea hearing in No. 03cr2066 MV, and again at the hearing in the

present case on January 5, 2009, fall into the category of "identity theft and check fraud," as Defendant Raymond reportedly was using the false identity of "Shawn Williams" as he accompanied Ms. Robinson, who was attempting to use "hot checks" and an "obviously altered driver's license" as part of "some kind of organized fraud" or a "conspiracy to commit . . . fraud."  [Ex. 2 to Doc. 308-3, Tr. 10-14-04, at 15-16; Doc. 497, Tr. 1-5-09, at 28, 35-36, 39.]  Police reports indicate that RRDPS and APD exchanged information about this line of evidence when they communicated about the arrest of Defendant Raymond and Ms. Robinson on June 29, 2002.  [Ex. 2 to Doc. 377-3, at 9-10.]

In addition, the pre-plea pre-sentence report that was disclosed to the USAO on July 8, 2004, before Defendant Raymond's plea agreement in No. 03cr2066 MV reported Defendant Raymond's affiliation with the "AB," or Aryan Brotherhood.  [Ex. 14 to Doc. 401.]  Mr. Valencia acknowledged that he was aware of Defendant Raymond's pre-plea pre-sentence report before the date of Defendant Raymond's plea agreement.  While Mr. Valencia could no longer recall the details of that report when he testified at the hearing on January 5, 2009, he also acknowledged that he might have received information about Defendant Raymond's affiliation with the Aryan Brotherhood through other sources, because law-enforcement agencies would attempt to "sell" a case for federal prosecution through such references to a defendant's gang-affiliation.  [Doc. 497, Tr. 1-5-09, at 28-30, 35-36, 38-39.]

This evidence of Defendant Raymond's gang affiliation and involvement in racketeering activity is very significant, because the fact that Defendant Raymond had or sought a position in the Aryan Brotherhood, as well as the conduct evincing that

organization's racketeering activities, are essential elements of *each* of the crimes charged under 18 U.S.C. § 1959(a) in the *Superseding Indictment*.   The murder, attempted murder, kidnapping, and conspiracies alleged therein do not become "violent crimes *in aid of racketeering*" without these essential elements.  See Smith, 413 F.3d at 1277; Fernandez, 388 F.3d at 1219-20; Crenshaw, 359 F.3d at 991.  As of October 14, 2004, the USAO already knew of conduct by Defendant Raymond which provides the factual basis for one or more of these essential elements of *each* of the charged offenses.  It follows that the plea agreement in No. 03cr2066 MV applies to *all* of the present charges against Defendant Raymond in No. 07cr748 MCA, not just those pertaining to Mr. George's disappearance. See Jordan, 509 F.3d at 197-98.

To draw the contrary inference that the USAO did not know anything about the various pending investigations by state and local officials with regard to Ms. Robinson, Defendant Raymond, their alleged involvement in Mr. George's disappearance, and Defendant Raymond's association with the racketeering activities of the Aryan Brotherhood at the time he entered his guilty plea in No. 03cr2066 MV, one would have to rely on a remarkably improbable series of coincidences: (a) the USAO managed to learn the details of Defendant Raymond's involvement in the incident of June 29, 2002, without simultaneously learning of Ms. Robinson's involvement in that incident or the communications between APD and RRPDS that she prompted at that time; (b)  despite the efforts by law enforcement agencies to "sell" the case for federal prosecution through "Project Exile" and the like, and despite the pressing need to develop evidence in support of

the effort to have Defendant Raymond's conditions of pretrial release revoked, the USAO entered into the plea agreement in No. 03cr2066 MV without first inquiring about Defendant Raymond's reported association with the "Aryan Brotherhood" or any additional crimes that he may have committed; (c) despite the USAO's usual practice of soliciting and assessing a defendant's cooperation *before* entering into a plea agreement, the USAO did not do so in that case, and (d) instead the USAO learned for the first time of the reports of Defendant Raymond's involvement in the disappearance of Mr. George through a "general canvassing" or "cold call" initiated by Special Agent Griego less than a month after the plea hearing but in ample time to alert the Court of these reports for purposes of the sentencing hearing.

I do not accept the theory that the Government's knowledge arose through such a series of coincidences. Rather, I find that Mr. Gonzales' testimony provides a more logical explanation that is corroborated by the surrounding circumstances. I therefore determine that Defendant Raymond has met his burden of proving that the present charges brought against him by the USAO in No. 07cr748 MCA are precluded by his plea agreement in No. 03cr2066 MV. I further determine that the proper remedy for this situation is to require the USAO to honor its obligations under the plea agreement in No. 03cr2066 MV and to dismiss the charges against Defendant Raymond in No. 07cr748 MCA without prejudice. Because the plea agreement in No. 03cr2066 MV does not bind state or federal agencies other than the USAO for the District of New Mexico, the dismissal of these charges does not necessarily preclude similar charges brought by another agency.

Further, my conclusion that the present charges against Defendant Raymond must be dismissed without prejudice does not suggest or imply that Mr. Valencia, other staff at the USAO, or other government witnesses in this matter have engaged in any misconduct. Both Mr. Valencia and his opposing counsel, Mr. Gonzales, are experienced attorneys, highly respected among their peers, who have appeared before me in numerous cases, and I have no reason to question their professionalism.

Although there was some effort to minimize the legal significance of the information which he undisputedly possessed before the plea agreement (such as the "Form 13" pre-plea pre-sentence report's reference to the Aryan Brotherhood), I find that during his testimony at the hearing on January 5, 2009, Mr. Valencia made a good-faith effort to recall the events concerning his prosecution of Defendant Raymond several years ago. Ultimately, however, his recollection was not clear enough to rebut the contrary evidence and corroborating circumstances presented by the defense in this case. Similarly, I find that Special Agent Griego and Agent Jessen credibly testified that it was not until November 2004 that they learned of Defendant Raymond's status as a suspect in Detective Hubbard's investigation into Mr. George's disappearance; however, their testimony in this regard does not preclude a reasonable inference that such knowledge reached the USAO through other, alternative channels of communication with state and local law-enforcement officials before that date.

### B.   Subpoenas, Motions to Quash Same, and Motions to Suppress

I next turn to the subpoenas and discovery requests that arose in the context of the hearings on Defendant Raymond's motion to dismiss. In response to such requests, the

Government has disclosed to Defendant Raymond and to the Court a substantial amount of information from the RRDPS files concerning the investigation of Mr. George's disappearance, as well as a substantial amount of information from the USAO's files regarding the prosecution of Defendant Raymond in No. 03cr2066 MV. Based on the existing record which includes the redacted versions of these files, I have determined that Defendant Raymond met his burden of proving that the charges against him in the present case are subject to dismissal without prejudice.

I therefore find it unnecessary to reach the question whether the Government should be required to make additional disclosures with respect to the files or testimony that Defendant Raymond attempted to subpoena for purposes of his motion to dismiss. Under these circumstances, there is no longer an active controversy regarding the Government's *Motion to Quash Subpoena Issued on October 9, 2008* [Doc. 388] as to the Rio Rancho Department of Public Safety (RRDPS) file, or the Government's *Motion to Quash Subpoena* [Doc. 397] regarding Assistant United States Attorney Louis Valencia. All motions relating to these subpoenas are denied as moot, with the understanding that the complete, original files produced to the Court will be returned to the USAO and that there is no need to disclose an unredacted version of these files in response to Defendant Raymond's subpoenas and discovery requests at this time.

Similarly, the dismissal without prejudice of the present charges against Defendant Raymond means that there is no remaining controversy as to Defendant Raymond's *Motion to Suppress Evidence Seized from 313 C Geraldine Loop, Rio Rancho, New Mexico* [Doc.

433] and his *Motion to Suppress Evidence Seized from 1992 Blue Chevrolet Camaro* [Doc. 435]. As this dismissal precludes Defendant Raymond from being brought to trial on these charges in this district, there is no occasion to determine what evidence, if any, would be inadmissible at such a trial by operation of the exclusionary rule. Therefore, these motions are also denied as moot.

### C.   Motion to Sever

I reach a different conclusion with respect to Defendant Raymond's *Motion to Sever Trials* [Doc. 425] filed on November 17, 2008. This Court's order dismissing the present charges against Defendant Raymond without prejudice does not necessarily moot the issue of severance, because the Government may wish to file an appeal from this order, and the interlocutory nature of such an appeal may depend on whether the charges or counts against Defendant Raymond continue to be joined with those against other Defendants. See 18 U.S.C. § 3731. A continued joinder of all Defendants in a single proceeding also could have implications for purposes of calculating the amount of excludable time under the Speedy Trial Act. See 18 U.S.C. §§ 3161(h)(1)(E), 3161(h)(7). So long as such a joinder is present, it could be argued that an appeal from the dismissal of the charges or counts against Defendant Raymond may have the effect of divesting this Court of jurisdiction over the *entire* case, thereby delaying hearings and trial(s) for the other Defendants.

If the Court were divested of jurisdiction over other Defendants by virtue of an appeal from the dismissal of the charges against Defendant Raymond, then the delays occasioned by an interlocutory appeal with respect to Defendant Raymond would likely cause unfair

prejudice to both the prosecution and the defense of the other remaining Defendants in this case. To avoid such unfair prejudice and clarify the finality of my ruling with respect to the dismissal of the charges against Defendant Raymond, I determine that there is good cause under Fed. R. Crim. P. 14 to sever all further proceedings against Defendant Raymond from the proceedings against the other three Defendants in this case, with the result that this Court retains jurisdiction over the case against the remaining Defendants while any appeal as to the dismissal of the charges or counts against Defendant Raymond is pending. See United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995) (concluding that the government's appeal as to one defendant did not divest the district court of jurisdiction to try co-defendants); United States v. Powell, 24 F.3d 28, 30-32 (9th Cir. 1994) (concluding that an appeal as to one count of an indictment does not divest the district court of jurisdiction to try other counts which have been severed pursuant to Fed. R. Crim. P. 14). I therefore grant Defendant Raymond's motion to sever concurrently with my ruling on his motion to dismiss.

## III.   CONCLUSION

For the foregoing reasons, the Court severs all further proceedings as to Defendant Raymond and dismisses the charges against him in the *Superseding Indictment* [Doc. 36] without prejudice.

**IT IS THEREFORE ORDERED** that Defendant Raymond's *Motion to Sever Trials* [Doc. 425] is **GRANTED**.

**IT IS FURTHER ORDERED** that all further proceedings regarding Defendant Raymond are severed from those pertaining to the other Defendants.

**IT IS FURTHER ORDERED** that Defendant Raymond's *Motion to Dismiss* [Doc. 308] is **GRANTED**.

**IT IS FURTHER ORDERED** that Counts 1, 2, 3, 4, 5, 7, and 8 of the *Superseding Indictment* [Doc. 36] are **DISMISSED WITHOUT PREJUDICE** as to Defendant Raymond only.

**IT IS FURTHER ORDERED** that the Government's *Motion to Quash Subpoena Issued on October 9, 2008* [Doc. 388] as to the Rio Rancho Department of Public Safety (RRDPS) filed on October 16, 2008, is **DENIED AS MOOT**, with the understanding that the complete file will be returned to the USAO and that there is no need to disclose an unredacted version of the file in response to Defendant Raymond's subpoenas or discovery requests at this time.

**IT IS FURTHER ORDERED** that  the Government's *Motion to Quash Subpoena* [Doc. 397] regarding Assistant United States Attorney Louis Valencia filed on October 20, 2008 is **DENIED AS MOOT**, with the understanding that the USAO's file in No. 03cr2066 MV will be returned to the USAO and that there is no need to disclose an unredacted version of the file in response to Defendant Raymond's subpoenas or discovery requests at this time.

**IT IS FURTHER ORDERED** that *Defendant's Motion to Suppress Evidence Seized from 313 C Geraldine Loop, Rio Rancho, New Mexico* [Doc. 433] is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that *Defendant's Motion to Suppress Evidence Seized from 1992 Blue Chevrolet Camaro* [Doc. 435] is **DENIED AS MOOT.**

**SO ORDERED** in Albuquerque, New Mexico, this 24th day of February, 2009.

**M. CHRISTINA ARMIJO**
**UNITED STATES DISTRICT JUDGE**